UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | | |
|---|---|---|
| TERRY LAFLEUR, | ) | Civ.  05-4153-KES |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | ORDER AFFIRMING |
| | ) | DENIAL OF VOCATIONAL |
| SOUTH DAKOTA DEPARTMENT OF | ) | REHABILITATION |
| HUMAN SERVICES, DIVISION OF | ) | SERVICES |
| REHABILITATION SERVICES; BETTY | ) | |
| OLDENKAMP, Secretary of South | ) | |
| Dakota Department of Human | ) | |
| Services; GRADY KICKUL, Director of | ) | |
| the South Dakota Division of | ) | |
| Rehabilitation Services; BERNIE | ) | |
| GRIMME, Assistant Director of the | ) | |
| South Dakota Division of | ) | |
| Rehabilitation Services; RANDY | ) | |
| CHRISTENSEN, District Supervisor | ) | |
| for the South Dakota Division of | ) | |
| Rehabilitation Services; and JILL | ) | |
| NASH-HOXENG, Senior | ) | |
| Rehabilitation Counselor for the | ) | |
| South Dakota Division of | ) | |
| Rehabilitation Services, each in their | ) | |
| individual and official capacities, | ) | |
| | ) | |
| Defendants. | ) | |

Plaintiff, Terry LaFleur, moves for reversal of the Secretary of South

Dakota Department of Human Services' (the Secretary) final decision denying

him vocational rehabilitation services under Title I of the Rehabilitation Act,

29 U.S.C. §§ 721-751.  LaFleur alleges that the Secretary violated the

Rehabilitation Act when she affirmed the decision of the South Dakota

Department of Human Services, Division of Rehabilitation Services (DRS),
which denied LaFleur's funding application for the assistance of a tutor to
prepare for the South Dakota Bar Exam, travel costs, and bar application
fees.  After agreeing to supplement the administrative record, LaFleur and the
Secretary stipulated that this action could be decided on the parties' briefs.
After considering the briefs and the supplemented administrative record, the
court affirms the Secretary's denial of vocational rehabilitation services.

**FACTUAL BACKGROUND**

LaFleur was injured in an industrial accident in 1983.  He stopped
working in 1984 and began receiving Social Security Disability Insurance
(SSDI) in April of 1994.

LaFleur started attending the University of South Dakota (USD) in the
spring of 1994 with the intent of completing his undergraduate degree,
entering law school, and becoming a licensed attorney.  LaFleur applied for
vocational rehabilitation services from DRS while he was attending USD.  DRS
determined LaFleur was eligible for vocational rehabilitation services and paid
over twelve thousand dollars towards LaFleur's tuition and books while he
attended USD.  Tab 9.[1]  While receiving services to attend USD, LaFleur was
informed that DRS would only assist him in obtaining his undergraduate

---

[1] Citations to "Tab" refer to the appropriate tab contained in Exhibit A of
the administrative record found at Docket 37.

degree.  Tab 3A; Tab 30.  LaFleur obtained his undergraduate degree from USD in December of 1997.  In January of 1998, LaFleur started working on a Masters in Business Administration at USD.  T.47-48.[2]

LaFleur, who was not accepted to law school at USD, entered Thomas M. Cooley Law School in Lansing, Michigan, in the fall of 1998.  T.48. Upon arriving in Michigan, LaFleur contacted Michigan Rehabilitation Services (MRS).  MRS agreed to provide LaFleur $2,000 per term that he attended law school.  Because Thomas M. Cooley Law School has three terms per year and LaFleur attended law school for four years, MRS provided LaFleur $24,000 (twelve terms x $2,000/term) to assist him during law school.  T.51.

LaFleur struggled academically while attending law school.  After the first trimester, LaFleur was placed on academic probation.  T.54.  Following the next trimester, LaFleur had failed to raise his GPA over a 2.0 in his core classes, and thus, he would normally have been placed on double academic probation.  Id.  The school made an exception for LaFleur because he took all elective courses.  Following the third trimester, LaFleur was released from academic probation because he successfully raised his GPA over a 2.0.  A trimester or two later, however, LaFleur was placed back on academic

---

[2] Citation to "T." refers to the corresponding page of the transcript of the administrative hearing found at Docket 37.

probation.  The trimester after that, he was placed on double academic
probation.  Id.  The dean of admissions then sent LaFleur to the Academic
Resources Center at Thomas M. Cooley Law School, where testing was
completed indicating that LaFleur may be suffering from ADHD.  T.54-55.
LaFleur was then tested by Dr. Fabiano, a psychologist, who diagnosed
LaFleur with ADHD and prescribed him Ritalin.  Following treatment for
ADHD, LaFleur's academic problems diminished.  LaFleur made the dean's
list three times in the last four trimesters (one time was before his diagnosis
and treatment for ADHD).  T.56-57.

 After graduating from Thomas M. Cooley Law School, LaFleur moved
back to South Dakota in May of 2002.  Prior to moving, LaFleur contacted
DRS to determine whether it would provide services to assist him in preparing
for and taking the South Dakota bar exam.  Because his file was still open, he
was determined eligible for services and DRS agreed to assist him in taking
the July 2002 bar exam.  Tab. 5A.  In an Individualized Plan for Employment
(IPE) dated April 2, 2002, DRS approved funding for LaFleur to attend the
PMBR review course.  Tab 6.  In a second IPE dated May 9, 2002, DRS
approved funding for LaFleur to obtain suits for interviews.  Tab 7.  DRS
approved a third IPE on July 11, 2002, in which DRS reimbursed LaFleur for
the cost of hotel, meals, and travel associated with attending the bar exam.
Tab 8.  This third IPE, which was agreed to and signed by LaFleur, states: "Go

4

to Pierre and take the test – this is a one shot deal and counselor will only assist [LaFleur] to take this test one time." Id.  The "other comments" section of this IPE states "[DRS] will assist [LaFleur] with taking the SD bar exam one time." Id.  LaFleur also sought and obtained services from MRS assisting him in taking the July 2002 bar exam.  MRS paid LaFleur's application fee and for LaFleur to attend the Bar/Bri review course.  LaFleur failed the July 2002 bar exam.  Tab 10.  He received a combined score of 113.18, and South Dakota requires a combined score of 130 to pass.  Id.

LaFleur decided to retake the bar exam in February of 2003.  DRS did not provide LaFleur any services because, after learning that MRS had an open file providing LaFleur services, DRS closed its file.  Tab 10.  DRS informed LaFleur that it would only fund future services if LaFleur provided verification that MRS had closed its file.  Id.; Tab 12.  MRS did, however, provide LaFleur services for his second attempt to pass the bar exam, namely funding for LaFleur's application fees, hotel, food, travel, and updated study materials.  T.64.  MRS also paid for ten hours of tutoring by a tutor located in Michigan.  Id.  LaFleur only communicated with his tutor through email, facsimile, and telephone.  Id.  LaFleur again failed the bar exam, scoring a combined score of 117.86.

LaFleur then applied to MRS for services to assist him in retaking the bar exam in February of 2004.  In an IPE dated April 8, 2003, MRS approved

LaFleur's request for services.  Tab 15.  MRS paid LaFleur's reapplication fee, the cost of his study materials, and travel costs to take the bar exam.  Id. MRS also approved funding for 18 hours of tutoring by a licensed South Dakota attorney.  T.67-68.  In this IPE, which LaFleur agreed to and signed, MRS stated it "will not provide financial support for any additional attempts at passing the bar exam," and LaFleur agreed "to explore other employment options if he does not pass the bar exam in 2003."  Tab 15.  LaFleur once again failed the bar exam, obtaining a combined score of 126.  Tab 16.

LaFleur then sought and obtained leave from the South Dakota Supreme Court to sit for the bar exam a fourth time.  On November 3, 2004, LaFleur applied for services from DRS to assist him with his fourth attempt at the bar exam.  Tab 17; T.71-72.  LaFleur sought funding for tutoring services from a licensed South Dakota attorney, travel costs, and bar application costs.

Jill Nash-Hoxeng, a vocational rehabilitation counselor for DRS, met with LaFleur that same day.  After verifying that LaFleur's file with MRS was closed, she informed LaFleur that he was presumed eligible for vocational rehabilitation services because he was receiving SSDI.  Tab 18.  She also informed him that she did not "feel that he had a vocational impediment and would not qualify for funding."  Id.  She told LaFleur that he needed to be tested regarding his alleged ADHD and learning disability.  LaFleur informed her that he was already being tested by Michael Fendt, a doctoral student at

USD.  LaFleur then signed a release permitting DRS to obtained Fendt's evaluation.

On November 22, 2004, DRS issued an eligibility certificate indicating that LaFleur was eligible for services because he was receiving SSDI.  Tab 20. Nash-Hoxeng failed, however, to follow her normal procedure of promptly sending a letter notifying LaFleur of his eligibility.  Tab 21, at 15.  Instead, she did not send the letter until March 24, 2005.  Tab 23.

On March 17, 2005, DRS received the evaluation completed by Fendt. Tab 21, at 3.  Fendt opined that LaFleur suffered from ADHD, Combined Type, and a Reading Disorder.  Tab 1.  After receiving the evaluation, Nash-Hoxeng forwarded it to DRS's medical consultant Dr. Van Kley.  After review, Dr. Van Kley recommended that LaFleur have a psychiatric evaluation to determine whether treatment for inattention would be helpful.  Tab 21, at 7. Dr. Van Kley also concluded that LaFleur did not satisfy DRS's criteria for a learning disability.  Id.

On April 15, 2005, after reviewing Fendt's evaluation, the records from MRS, and its own previous file, DRS denied LaFleur's request for vocational rehabilitation services to assist him in attempting the bar exam a fourth time. Tab 29.  LaFleur took the bar exam in July of 2005 without the requested services and failed again.  He obtained a combined score of 124.  (Docket 29, at 3).

## PROCEDURAL BACKGROUND

Following DRS's denial of services to assist LaFleur in preparing for his fourth bar exam, LaFleur requested a due process hearing before an independent hearing officer.  The hearing was held before Mr. Leo Disburg on May 17, 2005.  The hearing officer found that DRS properly determined that LaFleur's goal of becoming a licensed attorney was inappropriate or unattainable, and thus, the hearing officer affirmed DRS's denial of LaFleur's requested services.  LaFleur filed timely objections to the hearing officer's conclusions with the Secretary.  The Secretary adopted the hearing officer's decision and entered a final decision denying LaFleur's request for services. LaFleur then filed this action seeking review of the Secretary's decision pursuant to 29 U.S.C. § 722(c)(5)(J).

## STANDARD OF REVIEW

Congress has provided for a civil action to review denial of vocational rehabilitation services under Title I of the Rehabilitation Act.  See 29 U.S.C. § 722(c)(5)(J)(i) ("Any person aggrieved by a final decision [of the Secretary] may bring a civil action for review of such decision."); see also Reaves v. Mo. Dep't of Elementary & Secondary Educ., 422 F.3d 675, 681 (8th Cir. 2005). The reviewing court makes a determination "based upon the preponderance of the evidence" after considering all the records from the administrative hearing and the State's review and any additional evidence offered by the parties.  See

8

29 U.S.C. § 722(c)(5)(J)(ii).  The reviewing court determines "whether the agency's decision is supported by the preponderance of the evidence, while giving 'due weight' to the conclusions reached by the State's due process hearing."  Reaves, 422 F.3d at 681.  "This rather unusual statutory standard is more deferential than *de novo* review, and requires the district court to refrain from substituting its own notions of sound policy for those of the state authorities."  Id. (internal quotation and citation omitted).

When reviewing an agency decision denying an applicant's request for vocational rehabilitation services, the district court engages in a two-step analysis.  See Diamond v. Michigan, 431 F.3d 262, 266 (6th Cir. 2005).[3]  First, the court determines whether the agency followed the procedures required by the Rehabilitative Act and the corresponding regulations.  See id.; cf. Sch. Bd. of Indep. Sch. Dist. No. 11 v. Renollett, 440 F.3d 1007, 1011 (8th Cir. 2006) (stating that a reviewing court in an action under IDEA determines whether the school district complied with both IDEA's procedural requirements as well

---

[3] In Diamond, 431 F.3d at 266, the Sixth Circuit relied on case law interpreting the Individuals with Disabilities Education Act (IDEA) in determining the proper analysis for review of a state's decision under the Rehabilitation Act.  The court relied on IDEA case law because Congress used language in § 722(c)(5)(J) that is similar to the judicial review language contained in IDEA, 20 U.S.C. § 1451(i)(2)(A), (C).  The Eighth Circuit has also indicated that district courts should refer to IDEA case law when interpreting § 722(c)(5)(J).  See Reaves, 422 F.3d at 681 ("[T]he district court was correct to look to cases interpreting the IDEA for guidance regarding the appropriate standard of review under § 722(c)(5) of the Rehabilitation Act, given that the text and structure of the statutes are virtually identical.").

9

as its substantive requirements).  Procedural defects only warrant relief, however, if they cause substantive harm to the individual applying for services.  See Diamond, 431 F.3d at 266-67; cf. Indep. Sch. Dist. No. 283 v. S.D. by J.D., 88 F.3d 556, 562 (8th Cir. 1996) (stating that relief under IDEA is warranted if "procedural inadequacies compromised the pupil's right to an appropriate education, seriously hampered the parents' opportunity to participate in the formulation of the process, or caused a deprivation of educational benefits").  Second, the court must determine whether the agency's substantive decision to deny vocational rehabilitation services is supported by the preponderance of the evidence.  See Reaves, 422 F.3d at 681; see also Diamond, 431 F.3d at 266.

<strong>DISCUSSION</strong>

## I.    Procedural Errors

LaFleur alleges two specific procedural errors.  First, he contends that DRS failed to timely inform him of his eligibility for vocational rehabilitation services.  Second, he contends that DRS failed to develop his IPE in a timely manner.

### A.    Eligibility Determination

According to 34 C.F.R. § 361.41(b), DRS had to determine LaFleur's eligibility within 60 days after he applied for vocational rehabilitation services.  The hearing officer concluded that DRS complied with this requirement.  This

10

conclusion is supported by a preponderance of the evidence.  LaFleur applied for vocational rehabilitation services on November 3, 2004.  Tab 17.  DRS determined that LaFleur was eligible for services no later than November 22, 2004, when Nash-Hoxeng completed a certificate of eligibility.  Tab 20.

LaFleur does not dispute that DRS made its eligibility determination within 60 days.  Instead, LaFleur argues that DRS failed to timely notify him of its eligibility determination.  LaFleur contends that DRS did not notify him of his eligibility until Nash-Hoxeng sent him a letter on March 24, 2005.

The hearing officer found that Nash-Hoxeng informed LaFleur of his eligibility during their meeting on November 3, 2004.   This finding is supported by the preponderance of the evidence.  LaFleur contends that Nash-Hoxeng told him during the meeting that he would more likely than not be approved because he was receiving SSDI benefits, but that this was not guaranteed. T.73-74.  Although she admits that it may have been confusing for LaFleur, Nash-Hoxeng specifically testified that she informed LaFleur that he was presumed eligible during the interview because he was receiving SSDI. T.176-77.  The hearing officer necessarily believed Nash-Hoxeng's version of the conversation over LaFleur's version when the hearing officer determined that Nash-Hoxeng told LaFleur during their meeting on November 3, 2004, that he was eligible.  Because the hearing officer had the opportunity to observe the witnesses while they testified, this finding is entitled to deference

11

by this court.  See Renollett, 440 F.3d at 1010-11 (stating that district courts give "due weight" to conclusions from the hearing officer because the hearing officer "had an opportunity to observe the demeanor of the witnesses"). Additionally, both the intake form filled out by Nash-Hoxeng and her letter dated March 25, 2005, supports Nash-Hoxeng's testimony that she told LaFleur during their meeting that he was eligible for services.  Tab 18, at 3; Tab 23.  The court finds that Nash-Hoxeng informed LaFleur of his eligibility on November 3, 2004—the same day LaFleur applied for services.

Even if LaFleur did not learn of his eligibility until March 25, 2005, the court would not grant him relief.  LaFleur does not argue DRS violated statutory or regulatory requirements when it failed to inform LaFleur of his eligibility status in a timely manner.  Instead, he contends that DRS failed to follow its internal policy of sending letters to applicants immediately following a determination of eligibility.  Assuming, without deciding, that failure to follow an internal policy could in some instances create sufficient procedural irregularity to warrant relief under § 722(c)(5)(J), the court finds that no relief is warranted here.  LaFleur presents no evidence indicating that DRS's failure to provide timely notice of his eligibility status had any effect on whether he received the services requested.  Thus, any procedural irregularity associated with DRS's alleged failure to notify LaFleur of his eligibility for services does

not require reversal of the Secretary's final decision denying services.  <u>See</u>

<u>Diamond</u>, 431 F.3d at 266-67.

>    **B.**    **Develop IPE**

LaFleur also contends that DRS failed to develop his IPE in a timely

manner because, even though DRS determined he was eligible no later than

November 22, 2004, it did not deny his request for services until April 15,

2005.  The procedure for development of an IPE is contained in 34 C.F.R.

§ 361.45.  An IPE must be "developed and implemented in a timely manner for

each individual determined to be eligible for vocational rehabilitation

services."  34 C.F.R. §  361.45(a)(1).  Before formulating the IPE, DRS "must

conduct an assessment for determining vocational rehabilitation needs, if

appropriate, for each eligible individual . . . ."  34 C.F.R. § 361.45(b)(1).  "The

purpose of this assessment is to determine the employment outcome, and the

nature and scope of vocational rehabilitation services to be included in the

IPE."  <u>Id.</u>  To the extent possible, this assessment should be based upon the

data used to determine eligibility.  <u>See</u> 34 C.F.R. § 361.45(f)(1).  If the existing

data is insufficient to determine either the employment outcome or the nature

and scope of services to be provided, however, DRS "must conduct a

comprehensive assessment of the unique strengths, resources, priorities,

concerns, abilities, capabilities, interests, and informed choice, including the

need for supported employment services, of the eligible individual."  34 C.F.R. § 631.45(f)(2)(I).

Here, the hearing officer determined that DRS did not violate § 361.45(a)(1)'s requirement that LaFleur's IPE be developed in a timely manner.  The hearing officer found that after determining LaFleur's eligibility, Nash-Hoxeng performed a comprehensive assessment to determine LaFleur's "need for services."  The hearing officer further found that delays in obtaining information required for the assessment, specifically LaFleur's file from the MRS and the psychological evaluation performed by Fendt, prevented DRS from fashioning the IPE sooner, and that these delays were not caused by DRS.

The hearing officer's conclusion that DRS complied with § 361.45(a)(1) is supported by the preponderance of the evidence.  When LaFleur applied for services in November of 2004, he indicated that he was suffering from ADHD and a learning disability.  Tab 18, at 2; Tab 19, at 2, 4; T.73.  These cognitive limitations were new information for DRS.  When LaFleur previously obtained services from DRS, he was deemed eligible because he was receiving SSDI as a result of an orthopedic injury.  Because there was no previous information regarding these cognitive limitations, DRS could properly require a comprehensive assessment before fashioning the IPE.  See 34 C.F.R. § 361.45(f).

14

As part of the comprehensive assessment, Nash-Hoxeng wanted to have LaFleur subjected to a psychological evaluation.  LaFleur indicated that he was already undergoing testing by Fendt.  Tab 3; T.73.  LaFleur then signed a release permitting disclosure of Fendt's results to DRS.  Tab 19, at 4.  DRS did not receive Fendt's evaluation until March 17, 2005.  Tab 1; Tab 20.  Nash-Hoxeng then sent Fendt's evaluation to Dr. Van Kley, DRS's medical consultant, for independent review.  Tab 21, at 3; T.190.  Dr. Van Kley completed his review and returned the psychological evaluation sheet to DRS on March 28, 2005.  T.26.  DRS officially denied LaFleur's request for services on April 15, 2005, less than three weeks later.  Tab 29.  Because the comprehensive assessment needed to be completed before DRS could fashion an IPE, DRS denied the requested IPE in a timely manner in accordance with § 361.45(a)(1).

LaFleur suggests that the comprehensive assessment delay was unnecessary because DRS did not need any additional information before deciding whether to approve the requested services.  Specifically, he argues that DRS denied services because LaFleur had previously failed the bar exam despite receiving services, and thus, LaFleur's psychological evaluation was irrelevant to their decision.

The court disagrees that the comprehensive assessment was unnecessary.  The regulations provide that once DRS learned about LaFleur's

alleged cognitive limitations, it was both appropriate, and perhaps required, for DRS to obtain additional evidence regarding those limitations before fashioning LaFleur's IPE.  See 34 C.F.R. § 361.45(f).  Moreover, LaFleur's suggestion that DRS should have denied services without considering Fendt's evaluation is inconsistent with his assertion that his cognitive limitations entitle him to services under the Rehabilitation Act.

Finally, even assuming that the comprehensive assessment was unnecessary and that DRS failed to develop LaFleur's IPE in a timely manner, thereby violating § 361.45(a)(1), this procedural defect would not entitle LaFleur to relief.  LaFleur has presented no argument, let alone any evidence, to suggest how he was harmed by the untimely fashioning of the IPE.  Because LaFleur cannot establish that this alleged procedural defect caused him substantive harm, he is not entitled to relief under the Rehabilitation Act.  Diamond, 431 F.3d at 266-67.

## II.    Substantive Errors

LaFleur argues that the Secretary violated the Rehabilitation Act when she affirmed DRS's refusal to provide services to assist LaFleur in attempting the bar exam a fourth time.  In response, the Secretary argues that DRS properly exercised its discretion in refusing to approve the requested services.  The court agrees with the Secretary.

Once a person is determined to be eligible for services, DRS must assist that individual in developing an IPE.  See 29 U.S.C. § 722(b)(1)(A); 34 C.F.R. § 361.45(a)(1).  According to 29 U.S.C. § 722(b)(2)(B), the IPE "shall be developed and implemented in a manner that affords eligible individuals the opportunity to exercise informed choice in selecting an employment outcome [and] the specific rehabilitation services to be provided under the plan . . . ." 29 U.S.C. § 722(b)(2)(B).  The IPE must include "a description of the specific employment outcome that is chosen by the eligible individual, consistent with the unique strengths, resources, priorities, concerns, abilities, capabilities, interests, and informed choice of the eligible individual . . . ."  29 U.S.C. § 722(b)(3)(A); see also 34 C.F.R. § 341.46(a)(1).  "Whether an employment outcome is 'consistent' with the listed attributes ultimately is subject to the State's determination:  the choice of the individual must be 'approved and signed by a qualified vocational rehabilitation counselor employed by the designated State unit.'"  Reaves, 422 F.3d at 680 (quoting 29 U.S.C. § 722(b)(2)(C)(ii)).  A determination that an individual is eligible for services does not "create an entitlement to any vocational rehabilitation service."  34 C.F.R. § 361.42(a)(5).

Here, the hearing officer concluded that DRS's "refusal to agree to the specific IPE [LaFleur] requested was based upon a determination that his fourth attempt to pass the bar examination was not justified under the

17

circumstances.   DRS did not fail to develop an IPE meeting the requirements of the Rehabilitation Act, the parties simply did not agree on the appropriateness of [LaFleur's] goal." Proposed Decision, at 7.  The hearing officer concluded that DRS did not need to provide LaFleur services for "an employment goal which it reasonably concluded is inappropriate or unattainable." Id. at 8.  The court finds that these conclusions are supported by the preponderance of the evidence.

At the time DRS denied LaFleur's requested services, LaFleur had failed the exam three previous times despite receiving rehabilitation services for each prior attempt.  In his first attempt, DRS paid for LaFleur to attend the PMBR review course.  Tab 6.  DRS also reimbursed LaFleur for hotel, meal, and travel costs associated with taking the exam.  Tab 8.  Moreover, LaFleur agreed in the IPE providing reimbursement for the expenses incurred in taking the test that "this is a one shot deal and counselor will only assist [LaFleur] to take this test one time," and that DRS "will assist LaFleur with taking the SD bar exam one time." Id.  LaFleur also obtained assistance from MRS on the first attempt.  MRS paid LaFleur's application fee and for LaFleur to attend the Bar/Bri review course.  Tab 5E; T.61-62.  Despite these services, LaFleur failed the July 2002 bar exam.  Tab 10.

In support of LaFleur's second attempt to pass the exam, MRS again provided services.  MRS providing funding for LaFleur's application fees, for

18

hotel, food, and travel, and updated study materials.  T.64.  MRS also paid for ten hours of tutoring by a tutor located in Michigan.  Id.  Despite these services, LaFleur again failed the exam.

On the third attempt, LaFleur again obtained services from MRS.  MRS paid LaFleur's reapplication fee, the cost of his study materials, and travel costs to take the bar exam.  Id.  MRS also approved funding for 18 hours of tutoring by a licensed South Dakota attorney.  T.67-68.  In this IPE, which LaFleur agreed to and signed, MRS stated it "will not provide financial support for any additional attempts at passing the bar exam," and LaFleur agreed "to explore other employment options if he does not pass the bar exam in 2003." Tab 15.  LaFleur once again failed the exam.  Tab 16.

LaFleur's three failed attempts at passing the South Dakota bar exam establish by a preponderance of the evidence that LaFleur's employment outcome of becoming a licensed attorney is not "consistent with [his] unique strengths, resources, priorities, concerns, abilities, capabilities, interests, and informed choice of the eligible individual . . . ."  29 U.S.C. § 722(b)(3)(A); see also 34 C.F.R. § 341.46(a)(1).  This is further supported by the fact that LaFleur took and failed the bar exam a fourth time.  (Docket 29, at 3).  In fact, LaFleur's combined score of 124 on his fourth attempt actually decreased from this third attempt.  Id.  The court thus finds that DRS properly determined that LaFleur's employment outcome was not consistent with his

capabilities.  See Reaves, 422 F.3d at 680 (stating that the State determines whether an eligible person's employment outcome is consistent with that person's capabilities).

LaFleur raises several arguments suggesting that DRS erred in denying services.  First, he contends that his status as "an individual with a significant disability" requires DRS to provide him services for multiple attempts to pass the bar exam.  According to 29 U.S.C. § 705(21)(A), an individual with a significant disability is defined as

> an individual with a disability–
>
> (i) who has a severe physical or mental impairment which seriously limits one or more functional capacities (such as mobility, communication, self-care, self-direction, interpersonal skills, work tolerance, or work skills) in terms of employment outcome;
>
> (ii) whose vocational rehabilitation can be expected to require multiple vocational rehabilitation services over an extended period of time; and
>
> (iii) who has one or more physical or mental disabilities resulting from amputation, arthritis, autism, blindness, burn injury, cancer, cerebral palsy, cystic fibrosis, deafness, head injury, heart disease, hemiplegia, hemophilia, respiratory or pulmonary dysfunction, mental retardation, mental illness, multiple sclerosis, muscular dystrophy, musculo-skeletal disorders, neurological disorders (including stroke and epilepsy), paraplegia, quadriplegia, and other spinal cord conditions, sickle cell anemia, specific learning disability, end-stage renal disease, or another disability or combination of disabilities determined on the basis of an assessment for determining eligibility and vocational rehabilitation needs described in subparagraphs (A) and (B) of paragraph (2) to cause comparable substantial functional limitation.

Additionally, all individuals receiving SSDI are deemed to be "an individual with a significant disability."  29 U.S.C. § 722(a)(3)(A)(i).

LaFleur, who is receiving SSDI, correctly posits that he qualifies as "an individual with a significant disability."  He argues that DRS is thus required to fund additional attempts at passing the bar exam because, according to 29 U.S.C. § 705(21)(A)(ii), he is person "whose vocational rehabilitation can be expected to require multiple vocational rehabilitation services over an extended period of time."  The court disagrees.

LaFleur is deemed "an individual with significant disability" according to 29 U.S.C. § 722(a)(3)(A).  Subparagraph B of that paragraph states, however, that "[n]othing in this paragraph shall be construed to create an entitlement to any vocational rehabilitation service."  29 U.S.C. § 722(a)(3)(B). Additionally, DRS makes the determination whether LaFleur's employment outcome is consistent with his capabilities.  See Reaves, 422 F.3d at 680. Finally, as a practical matter, DRS has provided LaFleur considerable vocational rehabilitation services over a long period of time.  It provided him services throughout his undergraduate program at USD.  It also provided him services when he attempted the bar exam the first time.  And DRS may continue to fund services in the future–just not assistance with the bar exam that LaFleur seeks.

Second, LaFleur argues that DRS denied him services based upon faulty information, namely that the past services have not produced favorable results. LaFleur argues that the level of services provided increased each of his first three attempts at passing the bar exam, and that his score increased accordingly. LaFleur then notes that his score decreased when he did not receive services on his fourth attempt. LaFleur argues that this evidence indicates that services did in fact have a positive result, and thus, DRS's determination that LaFleur's chosen employment outcome of becoming a licensed attorney was unattainable was based on faulty information. The court disagrees. The undisputed evidence indicates that LaFleur had in fact failed the bar exam three times previously when DRS denied his request for services. Because the bar exam is a barrier to entry into the practice of law, LaFleur's repeated failure to pass the exam is sufficient basis for DRS to conclude that LaFleur's goal of becoming an attorney was so inconsistent with his capabilities that it was unwilling to use its limited resources to fund a fourth attempt. See Reaves, 422 F.3d at 681 (stating that the reviewing court cannot "substitut[e] is own notions of sound policy for those of the state authorities").

Third, LaFleur contends that DRS violated the Rehabilitation Act's preference for informed consent when it refused to grant him the services he requested. Although veiled as a denial of informed consent, LaFleur is

22

actually arguing that he should have unlimited ability to select an employment outcome, even if that employment outcome is inconsistent with his capabilities.  As the Eighth Circuit recognized in <u>Reaves</u>, 422 F.3d at 680, however, DRS, not LaFleur, determines whether LaFleur's chosen employment outcome is consistent with his capabilities.

Fourth, LaFleur argues that DRS erroneously relied on an internal policy determining what qualifies as a learning disability in denying him services.  The court disagrees.  The preponderance of the evidence indicates that DRS denied LaFleur's request for services because his past failures in passing the bar exam indicate that LaFleur's goal of becoming an attorney is unattainable, not because it concluded that LaFleur was not suffering from a learning disorder.

In sum, DRS determined that LaFleur's desired employment outcome of becoming a licensed attorney is not consistent with his capabilities.  After giving "due weight" to DRS's conclusions, the court finds that DRS's determination is supported by the preponderance of the evidence.  DRS thus properly refused to provide services assisting LaFleur to take the South Dakota bar exam a fourth time, and the Secretary properly affirmed the denial.  This court in turn affirms the Secretary's decision.

Based on the foregoing, it is hereby

ORDERED that the Secretary's decision denying LaFleur's request for funding to pay for tutoring, travel costs, and bar exam application costs is affirmed.

Dated May 10, 2007.

BY THE COURT:


/s/ *Karen E. Schreier*
KAREN E. SCHREIER
CHIEF JUDGE

24